STATE OF CONNECTICUT *v.* FERDINAND OQUENDO
(14215)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued April 30—decision released August 25, 1992

*Lauren Weisfeld,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Herbert Carlson,* assistant state's attorney, for the appellee (state).

GLASS, J. After a trial to a jury, the defendant, Ferdinand Oquendo, was convicted of the crimes of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), burglary in the second degree in violation of General Statutes § 53a-102 (a), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4) and conspiracy to commit burglary in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-102 (a).[1] The defendant was acquitted of the charges of murder in violation of General Statutes § 53a-54a (a), and conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). The trial

---

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe

court sentenced the defendant to a total effective term of imprisonment of fifty years. From this judgment of conviction, the defendant appealed pursuant to General Statutes § 51-199 (b).

On appeal, the defendant claims that: (1) the trial court improperly denied his motions to suppress certain evidence and the identification of him as the fruits of an illegal stop and seizure; (2) the trial court denied him his constitutional right to confrontation when a hearsay statement made by his brother was admitted into evidence, because his brother did not testify and, therefore, could not be cross-examined; (3) the prosecutor improperly commented on the defendant's election not to testify, in violation of the defendant's constitutional and statutory right to remain silent; and (4) the trial court improperly instructed the jury on reasonable doubt. We find merit in the defendant's first

that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

General Statutes § 53a-102 (a) provides: "A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

claim and, therefore, we reverse the judgment of conviction and remand the case to the trial court for a new trial.

The jury could reasonably have found the following facts. In the early morning hours of August 25, 1988, the Wethersfield police department responded to a telephone call from the Almar Motel in Wethersfield. At the motel, police found a man, later identified as Domingo "Billy" Huertas, lying outside of room 107, bleeding from a wound in his chest. Huertas was taken to a local hospital and given emergency treatment, but he died shortly after his arrival.[2] After securing aid for Huertas, the police followed a trail of blood to room 100. The doorjamb of room 100 had been broken and the lock plate was on the ground, indicating that the door had been forced open. Inside the room, the police observed more blood and the room in disarray. They found two firearms, a .38 caliber semi-automatic handgun and a .22 caliber handgun. Behind the motel the police found a green cloth bag on the ground. The registration card for room 100 indicated that it had been rented for one week on August 22, 1988, by Charles Morales.

On the evening of August 24, 1988, Jose Huertas, who was the victim's brother, Morales, the victim and a man named "Edgar" were at Morales' home in Hartford. Morales gave the victim a .38 caliber handgun and put a .22 caliber handgun into a small box along with a kilogram of cocaine. The four men then went to the Almar Motel, where they drank beer and smoked "crack" cocaine. After approximately one and one-half hours, Jose, Edgar and Morales left the motel. The victim remained in the motel room with the cocaine and the handguns. Additional facts will be detailed in connection with the consideration of specific issues.

---

[2] An autopsy revealed that the cause of death was a gunshot wound to the upper abdomen.

## I

The defendant first claims that the trial court improperly denied his motions to suppress certain physical evidence and identification evidence. On August 29, 1988, four days after the homicide of Huertas, Wallingford police officer William Birney seized cocaine from a gym-type duffel bag he found in the woods off Center Street in Wallingford. Birney subsequently identified the defendant as the man whom he had seen toss the bag into the woods. The defendant sought to suppress the cocaine and Birney's identification of him on the basis that they were the fruits of an illegal seizure, in violation of the defendant's rights under the fourth amendment to the United States constitution and article first, §§ 7, 8 and 9 of the Connecticut constitution.[3] The trial court denied the defendant's motions to suppress. Relying on the provisions of our state constitution, we conclude that the trial court's ruling was improper.

The trial court held a hearing on the defendant's motions to suppress, at which Birney was the only witness. Birney, a patrolman with approximately two and one-half years of experience at the time relevant to this appeal, testified as follows. On August 29, 1988, at

[3] The fourth amendment to the United States constitution provides in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The fourth amendment's exclusionary rule is applicable to the states through the fourteenth amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961).

Article first, § 7 of the Connecticut constitution provides in pertinent part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

Article first, § 8 of the Connecticut constitution provides in pertinent part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9 of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

approximately 12:50 a.m., Birney was patrolling in the area of East Main Street and Center Street in Wallingford in a marked police cruiser. Birney was wearing a uniform and a badge and was armed with a nightstick and a firearm. Birney described the area as primarily residential, with a shopping plaza that contains several small businesses. At the time of the patrol, all of the businesses were closed. Birney was aware that there had recently been a series of burglaries on East Main Street.

As Birney drove east on East Center Street, he saw a man and woman walking toward him. He recognized the woman as Nanette Williams, whom he recognized as having recently been arrested on larceny and burglary charges. Although it was "very warm" out, Williams was wearing a "thick jacket." Her male companion, later identified as the defendant, was wearing a zipped "winter" jacket and carrying a tan, "gym-type" duffel bag. As Birney drove past Williams and the defendant, they "kind of looked at each other" and appeared to quicken their pace. Birney was familiar with Wallingford's "street people" and had never seen the defendant. Birney thought that it was "strange" that the defendant was wearing a winter jacket when it was "so warm out." It was not raining at the time. Birney knew from experience that burglars often wear heavy clothing to protect themselves from injury when they break windows. He had a "hunch" that Williams and the defendant had recently committed or were about to commit a burglary.

Birney turned the cruiser around and drove back in the direction of Williams and the defendant. He stopped about seven yards away from them, exited the cruiser and stood by the driver's side door. Birney asked Williams what she and the defendant were doing. She replied that they were coming from the Junction Cafe. Birney knew that they were, in fact, walking in the

direction of the Junction Cafe and that the cafe had closed at 11 p.m., nearly two hours earlier. Birney then asked the defendant to identify himself and the defendant answered, "Freddy Velez." Both Williams and the defendant appeared nervous and kept glancing at each other. Birney asked the defendant to approach the cruiser. The defendant handed the duffel bag to Williams and stepped toward Birney. Birney instructed the defendant to bring the bag with him. The defendant then "grabbed the bag away from [Williams], gave a quick look up and down, and ran away." Birney yelled to the defendant to "stop" and pursued him on foot through a yard and into a wooded area. Birney saw the defendant throw down the duffel bag as he entered the wooded area. Birney retrieved the bag, which was open. Inside the duffel bag he saw two plastic bags containing white powder, which subsequently tested positive for cocaine.

The following morning, Birney and other Wallingford police officers searched the wooded area. In the area where Birney had last seen the defendant, another officer found a wallet containing a Connecticut identification card bearing the defendant's photograph and the name "Raphael Torres." As a result of the evidence retrieved by Birney and other Wallingford police officers, along with other evidence, the defendant was later arrested and charged with various crimes related to the homicide of Huertas.

The trial court concluded that an investigatory stop had occurred at some point after Birney exited his cruiser and began to question the defendant and Williams. The trial court found that Birney had based his conduct on his knowledge of recent burglaries in the area, his recognition of Williams as having been arrested recently for burglary and larceny, his experience that burglars often wear heavy outer garments and Williams' responses to his questions. The trial

court found further that the defendant's flight had provided Birney with additional grounds to stop the defendant. The trial court concluded that Birney had had a reasonable and articulable suspicion to believe that the defendant had been, or was about to be, engaged in criminal activity and, therefore, his stop of the defendant had been justified. Finally, the trial court concluded that the defendant had retained no reasonable expectation of privacy in the duffel bag once he had discarded it.[4]

---

[4] In ruling on the defendant's motion to suppress the cocaine found in the duffel bag, the trial court stated: "Well, based upon all of the evidence that I've heard and the reasonable inferences that could be drawn therefrom, I don't believe that there was any arrest. I agree with the state's attorney that [the] defendant was not taken into custody. Simply shouting at him doesn't do that. I think that what happened was when the officer drove up alongside of these people, the two people that were walking along the street at night, a police cruiser pulls up next to them, they stopped. I don't know whether there was a *Terry* stop at that point or not. But, certainly, when the officer got out and began to question them—in other words, at that point, I suppose they could have turned around and walked ahead and if he wanted to make a stop then he could have yelled for them to stop or commanded them to stop. But, in any event, they did stop, and the officer began to question them. And, I think, then, somewhere along the—at that time, we did have some type of an investigatory stop. And, then, the question is whether the officer had reasonable, articulate—a reasonable, articulate reason to stop them; he needs some type of probable cause to do so.

"This was in an area, a residential area, of homes and businesses. There had been, according to the officer, burglaries in the area. The people that he observed, the female was a person who had been arrested. The question is whether she had been arrested more than once. But, certainly, he had knowledge she had been arrested for burglary and for larceny. The—she was wearing—she and her companion were both wearing jackets. The officer indicated—he testified the weather was warm that evening and the jackets aroused his suspicion because people breaking and entering would wear jackets for protection and, I suppose, to secrete any items that may have been taken, on their person. It may have been that there were other reasons to wear jackets. The weather might have been sufficient so that people would have jackets, but these people not only had the jackets in their possession but they had the jackets on and, according to the officer, zipped up. If it was a warm evening in which there were—rain or storms in the area, the people could have taken the jackets off; it would have made more

In his appeal to this court, the defendant claims that Birney made an investigatory stop without a reasonable and articulable suspicion, in violation of the fourth amendment to the United States constitution and article first, §§ 7, 8 and 9 of the Connecticut constitution. The state argues that Birney did not effectuate a stop but, rather, engaged in a "consensual encounter" with the defendant. Alternatively, the state contends that even if a stop occurred, Birney had a reasonable and articulable suspicion to stop the defendant, based on the observations he had made before exiting his cruiser, together with Williams' responses to his questions.

sense. They could carry the jackets. Mr. Oquendo, the person identified as Mr. Oquendo, was carrying a bag. The jacket could have been put in the bag. So, these things seem to indicate that the officer did have a reasonable, articulate reason to stop and conduct an investigation. And, when the female made the reply that didn't—to the officer didn't make sense, that they were coming from a particular bar and—which had been closed for some time and, I think, actually going in the wrong direction, those two things further caused him to have a reason to investigate what the parties were doing. At that point or very shortly thereafter, I think testimony is that [the] defendant gave the bag to the female and approached the officer and then took the bag back and absconded. I think the officer had a right under the law to continue his investigation, and he chased after the defendant, yelled for him to stop. I don't believe that he ever exercised any control over him, took custody of him so to actually make an arrest. He did have reason to continue his investigation. The flight itself is further concern; he was carrying a bag. Then, what we had was, in the dark at night, the defendant ran down a trail into a wooded area and threw the bag away. At that point, I think the officer was justified in taking the bag because even though there weren't other people around, it was in a wooded area, at night. The bag—it's highly questionable anyone throwing a bag or something like that away under those circumstances, as to whether they had any reasonable expectation of privacy in the bag. There was a case that I was involved in, I don't remember the name of it, but a similar thing, a bag with a shotgun in it, and the fellow was being chased by the officer; he threw the bag away; the officer picked up the bag, and I know the Appellate Court or the Supreme Court upheld that as—the Appellate Court, I believe, on the grounds that there was no reasonable expectation of privacy in the bag—once he throws it away.

"That being the case, then there was the right to seize it. The officer was concerned that if he left the bag there, also, and went after the defend-

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres,* 197 Conn. 620, 625, 500 A.2d 1299 (1985).

Our threshold inquiry is at what point, if any, did the encounter between Birney and the defendant constitute an investigatory stop or seizure. If we conclude that there was such a seizure, we must then determine whether Birney possessed a reasonable and articula-

ant, then this other woman—the woman could have gone back, opened the bag, and taken a weapon out of it.

"So under those circumstances, I think he had a right to seize the bag, and since there was no reasonable expectation of privacy in the bag, had a right to ascertain as to whether there was any weapon in it or any other item, and he did so. The—it would appear to me that there's been no—in this whole proceeding, there's been no violation of the defendant's rights under the Constitution of the United States or the law of the state of Connecticut. And, therefore, I'm going to overrule your motion to suppress, and the items may be admitted."

The trial court did not hold a separate hearing on the defendant's motion to suppress Birney's identification of him as the person who discarded the bag containing the cocaine. In its judgment, however, the trial court indicated that it had denied the defendant's motion to suppress Birney's identification of him on October 4, 1990, the same date the court denied the defendant's motion to suppress the cocaine. The state asserts that the present record contains no findings on whether Birney's identification of the defendant arose from his stop of the defendant. The state, therefore, asks this court, in the event that we should conclude that an illegal seizure occurred, to remand the case to the trial court for further findings on whether the identification resulted from the illegal detention. It is apparent from the defendant's motion to suppress identification evidence that the defendant sought to suppress identification of him as the individual who *discarded* the bag, because it was only after the discard that Birney discovered that the bag contained contraband. Thus, because we conclude that there was an illegal seizure of the defendant prior to his discarding of the bag; see part IA, infra; no remand on the issue of identification is necessary. In so concluding, we do not, however, address the admissibility of any identification evidence that may have arisen out of Birney's observations of the defendant *prior to* the illegal seizure.

ble suspicion at the time the seizure occurred. We conclude that, pursuant to article first, §§ 7 and 9 of the state constitution, there was a seizure. We conclude, further, that the stop was not supported by a reasonable and articulable suspicion and, therefore, that the contrary conclusion of the trial court was clearly erroneous.

A

The defendant appears to concede that under current fourth amendment analysis, Birney's actions would not constitute a seizure.[5] Accordingly, we confine our analysis to the relevant provisions of the Connecticut constitution. The defendant argues that under article first, §§ 7 and 9 of our state constitution, he was seized when Birney asked him to come over to the cruiser with his bag.[6] The state argues that no seizure took place and urges this court to adopt the holding of *California* v. *Hodari D.,* 499 U.S.     , 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); see footnote 6, supra; in interpreting the contours of a seizure under the state constitution.

In analyzing claims of illegal seizure under article first, §§ 7 and 9 of the Connecticut constitution, we have previously adopted the standards created by the United States Supreme Court for the analysis of claims of illegal seizure under the fourth amendment to the United States constitution. See *Terry* v. *Ohio,* 392 U.S.

[5] In *California* v. *Hodari D.,* 499 U.S.     , 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690 (1991), the United States Supreme Court held that a seizure within the meaning of the fourth amendment to the United States constitution requires either physical force or submission to the assertion of authority.

[6] The state argues that the defendant provides no independent state constitutional analysis and, therefore, that this court should decline to review his claim under article first, §§ 7 and 9 of the Connecticut constitution. Although the defendant's analysis under the state constitution is less than exhaustive, he has clearly invoked his rights thereunder and, accordingly, we shall consider his claim.

1, 20–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980); *Florida* v. *Royer,* 460 U.S. 491, 501–502, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). We have thus defined a person as "seized" under our state constitution when " 'by means of physical force or a show of authority, his freedom of movement is restrained.' " *State* v. *Ostroski,* 186 Conn. 287, 291, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982), quoting *United States* v. *Mendenhall,* supra. In determining whether a seizure has occurred, so as to invoke the protections of our state constitution, we have stated that a court is to consider whether " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *State* v. *Ostroski,* supra, 292, quoting *United States* v. *Mendenhall,* supra, 554. "Whether there has been such a seizure in an individual case is a question of fact." *State* v. *Ostroski,* supra.

The state urges us to abandon these well established standards for the test now employed by the United States Supreme Court in determining whether a seizure has occurred under the fourth amendment.[7] See *California* v. *Hodari D.,* supra. The state argues that Birney's interaction with the defendant was a "consensual encounter," or, at most, an "attempted seizure."[8] The state contends that in light of the United

---

[7] The state previously asked this court to adopt the holding of *California* v. *Hodari D.,* 499 U.S. , 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), in *State* v. *Cofield,* 220 Conn. 38, 595 A.2d 1349 (1991). In *State* v. *Cofield,* supra, 49–50, however, we assumed that a seizure had occurred and because we concluded that a reasonable and articulable suspicion existed for the seizure, we declined to address the applicability of *Hodari D.*

[8] During oral argument the state conceded that Birney's actions could be characterized as an "attempted seizure" at the point that he asked the defendant to approach with the duffel bag. Subsequently, however, the state

States Supreme Court's decision in *California* v. *Hodari D.*, supra, this court should hold that there was no seizure of the defendant under the state constitution and, therefore, that the search of the defendant's bag did not violate his state constitutional rights.

In *California* v. *Hodari D.*, supra, two police officers, wearing jackets with "police" embossed on both sides, were patrolling a high-crime area in an unmarked vehicle. A group of youths, including the defendant, fled at the approach of the police vehicle. One of the officers gave chase on foot. He observed the defendant toss away a small rock. After restraining the defendant, the officer recovered the rock, which later proved to be cocaine. The United States Supreme Court framed the question presented as "whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield." Id., 1550. The state conceded that the officer did not have the "reasonable suspicion" required under *Terry* v. *Ohio*, supra, to stop the defendant. *California* v. *Hodari D.*, supra, 1549 n.1. The court concluded, however, that the police officer's chase of the defendant was not a "seizure" of the person within the meaning of the fourth amendment. In reaching this conclusion, the court reasoned that a seizure for fourth amendment purposes is equivalent to an arrest at common law, which it defined as requiring "either physical force . . . or . . . submission to the assertion of authority." (Emphasis omitted). Id., 1551. The court thus held that, even if it was assumed that the officer's pursuit constituted a "show of authority" for fourth amendment purposes, because the defendant did not submit to that authority until *after* he had discarded the cocaine, the cocaine was properly admitted into evidence. Id., 1552.

returned to the position advanced in its brief, that Birney's action was, at most, an "attempted seizure" at the point that Birney pursued the defendant and ordered him to "stop."

The state urges this court to read the definition of a "seizure," as interpreted by the United States Supreme Court in *California* v. *Hodari D.,* supra, into article first, §§ 7 and 9 of our state constitution. The state argues that since Birney never applied physical force to the defendant's person and the defendant did not submit to Birney's assertion of authority when he ordered the defendant to stop, the defendant's state constitutional rights were not implicated.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992). Although we have often relied upon decisions of the United States Supreme Court interpreting the fourth amendment to define the protections provided by related provisions of our state constitution, we have at times determined that the state constitution affords greater protections to the citizens of Connecticut than does the federal constitution, as interpreted by the United States Supreme Court. Id.; see also *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990); *State* v. *Dukes,* 209 Conn. 98, 547 A.2d 10 (1988). We have stated, moreover, that "[t]he Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes,* supra, 115. Thus, " 'the law of the land' may not, in [the] state constitutional context, also be 'the law of the state of Connecticut.' " Id., 114. In the present case, we must decide whether article first, §§ 7 and 9 of the Connecticut constitution afford greater protection to the citizens of this

state than does the federal constitution in the determination of what constitutes a seizure. We conclude that they do.

The state claims that "[t]he restraints associated with a common law arrest or detention best exemplify the contours of what constitutes a seizure" under article first, §§ 7 and 9 of the Connecticut constitution. The state contends that at common law, arrest contemplated "the physical touching of a suspect, or the employment of means that ensure[d] the effective control over or confinement of the suspect." The state argues, therefore, that pursuant to the common law doctrine of arrest as it existed in Connecticut, our state constitutional standard is "coextensive" with the federal standard set forth in *California* v. *Hodari D.,* supra. We disagree.

At common law in Connecticut, an arrest was defined as "the apprehending or restraining the person of another . . . ." 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 386 (System). While it is true that at common law "mere words" could not effect an arrest, an arrest could be made without touching the person if sufficient indicia were present that the person was not free to leave. 1 Z. Swift, A Digest of the Laws of Connecticut (1822) p. 499 (Digest) (arrest occurs when peace officer enters a room, tells defendant he is arresting him and locks the door). Legal documents in existence prior to the adoption of the state constitution in 1818 demonstrate a profound concern with the right of personal liberty. In writing of this "sacred and inestimable right" in 1796, Zephaniah Swift, who served as Chief Justice of this court from 1815 to 1819, stated that "no man can be restrained of his liberty; be prevented from removing himself from place to place, as he chuses; be compelled to go to a place contrary to his inclination, or be in any way imprisoned, or confined, unless by virtue of the express

laws of the land." 1 Z. Swift, System, supra, p. 180. The only violation of the right of personal liberty was by false imprisonment, which consisted of "the detention of a person without any legal authority." 2 Z. Swift, System, supra, p. 57. Moreover, every "detention" or "confinement" of the person "in any shape," including *the forcible detention of a person in the street,* constituted an imprisonment. Id.; see also 1 Z. Swift, Digest, supra, p. 17.

In *California* v. *Hodari D.,* supra, Justice Scalia, writing for a majority of the United States Supreme Court, purported to rely on the common law definition of arrest for the conclusion that a seizure under the fourth amendment requires either physical force or submission to the assertion of authority. In response to the dissenters' contention that an *attempted* arrest was also unlawful at common law, Justice Scalia wrote: "[I]t is irrelevant that English law proscribed 'an unlawful *attempt* to take a presumptively innocent person into custody.' . . . [N]either usage nor common-law tradition makes an attempted seizure a seizure. The common-law may have made an attempted seizure unlawful in certain circumstances; but it made many things unlawful, very few of which were elevated to constitutional proscriptions." (Emphasis in original.) Id., 1550–51 n.2. We are persuaded that the distinction made by the United States Supreme Court between an arrest and an attempted arrest at common law does not guide our determination of what constitutes a seizure under article first, §§ 7 and 9 of our state constitution.[9]

---

[9] At least one distinguished commentator has criticized the distinction made by the majority in *California* v. *Hodari D.,* 499 U.S.    , 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), between an arrest and an attempted arrest for the purposes of defining the contours of a "seizure" under the fourth amendment. See 3 W. LaFave, Search and Seizure (2d Ed.) § 9.2.

The distinction between an arrest and an attempted arrest at common law reflected the difference between battery and assault. *California* v. *Hodari D.*, supra, 1553–54 (Stevens, J., dissenting); see also 3 W. LaFave, Search and Seizure (2d Ed.) § 9.2. We have previously set forth the concept of the right of personal liberty and the scope of the intrusions on that right, as they existed at common law in this state. "Every confinement of a person *in any shape*" constituted an imprisonment, for which, if it were accomplished without legal authority, an action for false imprisonment would lie. (Emphasis added.) 1 Z. Swift, Digest, supra, p. 18. Among the specific intrusions on personal liberty that constituted an imprisonment at common law was the unlawful, forcible detention of a person *in the street.* On the basis of these common law antecedents of article first, §§ 7 and 9 of our constitution, we are persuaded that the dichotomy between an attempted arrest and an arrest "should not take on constitutional dimensions." See *California* v. *Hodari D.*, supra, 1553 (Stevens, J., dissenting). Accordingly, we decline to adopt the restricted definition of a seizure employed by the United States Supreme Court in *Hodari D.* and adhere to our precedents in determining what constitutes a seizure under the state constitution.[10] See *State* v. *Mitchell*, 204 Conn. 187, 193–94 n.4, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Ostroski*, supra, 290–92.

We now apply these precedential standards to the facts of this case. Birney was on patrol in a marked

---

[10] The state asserts the following policy reasons in support of its claim that submission to a show of authority should be deemed essential to a seizure under the state constitution: (1) it would provide a "bright line rule" for both police and defendants; (2) it is unlikely that the police would abuse such a standard; and (3) a suspect who has not submitted to an assertion of authority and who has not been in custody should not benefit from the constitutional provisions applicable to detentions. The state, however, offers no substantive arguments in favor of these claimed policy reasons, and accordingly, we decline to consider them.

police cruiser. He drove past the defendant and Williams, turned around and stopped approximately twenty feet away from them. Birney then stepped out of the cruiser and stood next to the driver's door as the defendant and Williams walked toward him. Birney was dressed in full police uniform and visibly armed with a gun and a nightstick. After Birney asked Williams where she and the defendant were going, he asked the defendant his name. The defendant gave him the name "Freddy Velez." Birney told the defendant to approach the cruiser. The defendant gave the bag to Williams and stepped toward Birney. Birney told the defendant to bring the bag with him.

The state characterizes this entire interaction as a consensual encounter. Under our state constitution what starts out as a consensual encounter becomes a seizure if, on the basis of a show of authority by the police officer, a reasonable person in the defendant's position would have believed that he was not free to leave. *State* v. *Ostroski*, supra, 291–92. In view of all the circumstances, including the lateness of the hour, the fact that Birney was armed and the fact that there was no one other than the defendant and Williams in the vicinity, we are persuaded that a reasonable person in the defendant's position would not have believed that he was free to ignore Birney's instructions and walk away. Accordingly, we conclude that a seizure took place within the meaning of article first, §§ 7 and 9 of the Connecticut constitution.

B

Having determined that a seizure of the defendant took place, we must next determine whether the trial court properly concluded that the seizure was based on a reasonable and articulable basis of suspicion. We conclude that the trial court's determination was clearly erroneous.

Article first, §§ 7 and 9 of our state constitution permit a police officer "in appropriate circumstances and in an appropriate manner" to detain an individual for investigative purposes even though there is no probable cause to make an arrest. *State* v. *Mitchell,* supra, 195; *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990). In determining whether the detention was justified in a given case, a court must consider if " '[b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *State* v. *Scully,* 195 Conn. 668, 674, 490 A.2d 984 (1985), quoting *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. See *State* v. *Braxton,* 196 Conn. 685, 689, 495 A.2d 273 (1985). These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio,* supra, with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution. *State* v. *Lamme,* supra; *State* v. *Scully,* supra, 674–75 n.12.

The defendant contends that the factors considered by Birney in asking the defendant to approach the cruiser with his duffel bag did not amount to a reasonable and articulable suspicion. The state counters that if this court concludes that Birney's request that the defendant bring the bag over to the police car was a seizure, Birney at that point had reasonable and articulable suspicion based on his initial observations of the appearance and behavior of Williams and the defendant, coupled with Williams' responses to Birney's questions. We agree with the defendant.

Although burglaries had been reported in the general area of Birney's patrol, Birney had not received any report that a burglary had been committed in that area on the evening of August 29, 1988, nor did he possess information linking the defendant or Williams to a particular burglary in the area. Moreover, although Birney testified that the manner of dress of the defendant and Williams fit the profile of burglars, he acknowledged that homeless people often dress in a similar manner and carry items with them. The fact that Williams was known to Birney as a recent arrestee for larceny and burglary could not supply Birney with reasonable suspicion about the defendant. In addition, the fact that Birney did not recognize the defendant from his familiarity with "street people" in Wallingford could not provide justifiable grounds for a stop. Finally, while Williams may have given false answers to Birney's questions, her responses did not provide Birney with a reasonable suspicion regarding *the defendant's* activities.

We are persuaded that Birney's suspicion that the defendant had been or was about to be engaged in criminal activity was not constitutionally sound.[11] We also reject the state's argument, and the trial court's conclusion, that the defendant's flight, when viewed in conjunction with Birney's other observations, provided Birney with the requisite level of suspicion to seize the defendant. While a suspect's flight may, in certain cases, be considered in determining whether

[11] The defendant asserts that upholding the police officer's basis for the stop made in this case could have the effect of encouraging police questioning of homeless people who are not recognized by the police and are walking at night in an area where a crime has recently occurred. We agree and conclude that this risk extracts too high a constitutional price. "A history of past criminal activity in a locality 'does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality.' . . ." (Citations omitted.) *State* v. *Cofield,* 220 Conn. 38, 50–51, 595 A.2d 1349 (1991) (*Glass, J.,* dissenting).

there existed a reasonable and articulable basis of suspicion; see *State* v. *Rodriguez,* 14 Conn. App. 574, 578, 542 A.2d 342 (1988); police conduct that *provokes* flight precludes the consideration of this factor. See, e.g., *State* v. *Williamson,* 10 Conn. App. 532, 540, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987). As the Appellate Court has warned: "Were it otherwise, the officer could use the suspicious conduct that he himself induced as evidence that the defendant was acting suspiciously." Id.

We recognize that police on patrol perform a variety of functions.[12] Thus, a police officer, in carrying out his duties, may stop and speak to an individual on the street without necessarily implicating the individual's constitutional rights. See *State* v. *Damon,* 214 Conn. 146, 153, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); *State* v. *Williamson,* supra. We acknowledge, furthermore, that the police must enjoy a certain degree of latitude in making investigative stops. Nevertheless, the requirement of a reasonable and articulable factual basis for an investigative stop must be met. We have consistently stated that a police officer's decision to detain an individual for investigatory purposes "must be predicated 'on more than a mere hunch.' " *State* v. *Scully,* supra, 675; *State* v. *Aversa,* 197 Conn. 685, 691, 501 A.2d 370 (1985).

We are persuaded that the informational basis advanced by Birney to justify his stop of the defend-

---

[12] As the United States Supreme Court has stated: "Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." *Terry* v. *Ohio,* 392 U.S. 1, 13, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

ant, which Birney himself characterized as a "hunch," was insufficient to support a reasonable and articulable suspicion. In a close case like the present one, the balance ought to be struck on the side of the freedom of the citizen from governmental intrusion. To conclude otherwise would be to elevate society's interest in apprehending offenders above the right of citizens to be free from unreasonable stops. The record in the present case does not disclose circumstances which, viewed in their totality, yielded sufficient specific and articulable facts to make constitutionally reasonable Birney's detention of the defendant. Accordingly, we conclude that the defendant was illegally seized, in violation of article first, §§ 7 and 9 of the Connecticut constitution.

## C

Our conclusion that the defendant was illegally seized does not end our inquiry. We must next determine whether the defendant's discarding of the bag and Birney's resulting seizure of the cocaine and identification of the defendant were the products of the illegal seizure. We conclude that they were.

After oral argument to this court, the parties submitted supplemental briefs on the question of whether there was a basis in fact and in law to sustain the trial court's denial of the defendant's motions to suppress under the doctrine of abandonment.[13] In his supplemental brief, the defendant argues that he did not voluntarily abandon the bag because his action was induced by an illegal seizure of his person and, thus, the trial court's ruling cannot be upheld on a theory of abandonment. The state contends, in its brief, that the trial

[13] The parties were ordered by this court to submit supplemental briefs addressing the following question: "As an alternative ground for the denial of the motion to suppress the evidence, was there a basis in fact, and in law, under the doctrine of abandonment?"

court's ruling should be affirmed on the basis that the defendant retained no reasonable expectation of privacy in the bag when he discarded it in the course of Birney's pursuit of him.[14] We are persuaded that the trial court's ruling cannot be sustained on a theory of abandonment and, therefore, that the trial court's finding to the contrary was clearly erroneous.

In distinguishing abandonment for the purposes of search and seizure analysis from the concept of abandonment in property law, the Minnesota Supreme Court has stated: "In the law of search and seizure . . . the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. . . . In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein." *St. Paul* v. *Vaughn,* 306 Minn. 337, 346, 237 N.W.2d 365 (1975). The court went on to state that "[w]here the presence of the police is *lawful* and the discard occurs in a public place where the defendant cannot reasonably have any continued expectancy of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure." (Emphasis added.) Id., 346–47; see also *State* v. *Mooney,* 218 Conn. 85, 106–107, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). Conversely, "where a person has disposed of property in response to . . . an *illegal* [seizure or search by police], courts have not hesitated to hold that property inadmissible." (Emphasis added.) 1 W. LaFave, Search and Seizure (2d Ed.) § 2.6 (b); see,

---

[14] The state also argues that the trial court's denial of the defendant's motion to suppress can be supported on the basis that items discarded before a suspect is caught or "seized" are not the product of any seizure. In light of our conclusion that there was a seizure of the defendant before he discarded the bag, we do not address this theory propounded by the state.

e.g., *United States* v. *Beck,* 602 F.2d 726, 729–30 (5th Cir. 1979) (objects thrown out of car window after illegal stop properly excluded from evidence); *State* v. *Lemmon,* 318 Md. 365, 380–81, 568 A.2d 48 (1990) (drugs discarded by defendant fleeing police after illegal seizure inadmissible); but see *State* v. *Oliver,* 368 So. 2d 1331, 1335–36 (Fla. App. 1979), cert. dismissed, 383 So. 2d 1200 (Fla. 1980) ("a person's otherwise voluntary abandonment of property cannot be tainted or made involuntary by a prior illegal police stop of such person"); *People* v. *Boodle,* 47 N.Y.2d 398, 404, 391 N.E.2d 1329, 418 N.Y.S.2d 352, cert. denied, 444 U.S. 969, 100 S. Ct. 461, 62 L. Ed. 2d 383 (1979) (defendant's discarding of gun after illegal seizure was "abandonment" because it was not a "spontaneous reaction" to seizure but rather was "an independent act involving a calculated risk"). We are persuaded that the weight of authority counsels in favor of our conclusion that there was no abandonment in this case.[15]

In *California* v. *Hodari D.,* supra, 1550, the United States Supreme Court intimated in dicta that even where there is an initial unlawful seizure, the defendant's flight terminates the seizure so that items discarded in the course of flight are not evidence disclosed "during the course of an arrest." We disagree. Article first, § 8 of our state constitution protects citizens against the admission of evidence at trial that is obtained as a result of the unlawful activities of the police. See *State* v. *Dukes,* supra, 108–10. The relevant inquiry is whether the unlawful conduct of the police

---

[15] In *State* v. *Mooney,* 218 Conn. 85, 98–113, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991), this court addressed the question of whether the defendant, a homeless person who had left a duffel bag and cardboard box under a bridge abutment that he considered his home, had a reasonable expectation of privacy in those items. We did not consider in *Mooney,* however, the question presented in this case, i.e., whether a person's effects can be deemed "abandoned" when they were discarded in response to an illegal seizure.

*induced* the disposal of the incriminating items by the defendant. We reject the implication of the dicta in *Hodari D.,* that the chain of causation is broken when a suspect escapes from an unlawful seizure, thereby allowing the admission in evidence of items subsequently discarded. We are persuaded that following this reasoning could encourage illegal stops by the police. See *State* v. *Williamson,* supra; 1 W. LaFave, Search and Seizure (2d Ed.) § 2.6 (b) n.62.

The trial court concluded that the defendant had no reasonable expectation of privacy in the duffel bag that he discarded during Birney's pursuit of him. This conclusion of the trial court was clearly erroneous. We conclude that the defendant did not abandon the duffel bag that he discarded during Birney's *unlawful* pursuit of him. We conclude, however, that the defendant's wallet and its contents were properly admitted into evidence under a theory of abandonment since the record does not disclose that the wallet was discarded in response to Birney's pursuit.

D

We have concluded that the cocaine and the identification of the defendant as the person who discarded the duffel bag containing the cocaine were the fruits of an illegal seizure. Accordingly, the trial court should have excluded this evidence pursuant to article first, § 8 of the state constitution. *State* v. *Dukes,* supra. The state has the burden of proving that the admission of evidence in violation of our state constitution was harmless beyond a reasonable doubt. See *State* v. *Duntz,* 223 Conn. 207, 221, 613 A.2d 224 (1992); *State* v. *Jones,* 215 Conn. 173, 184, 575 A.2d 216 (1990). "The test for harmfulness is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Duntz,*

supra. The state has advanced no argument that the admission of the cocaine and the identification of the defendant were harmless error and, therefore, has failed to meet its burden. We conclude that the admission of this evidence was harmful to the defendant. Accordingly, we reverse and remand the case to the trial court for a new trial.

## II

The defendant next claims that he was denied his constitutional right to confrontation when a hearsay statement made by his brother was admitted into evidence, because his brother did not testify and, therefore, could not be cross-examined. Because we are reversing the judgment of conviction on the basis of the defendant's first claim, we address this claim only insofar as it may arise on retrial.

Robert Cruncleton was arrested on September 20, 1988, on charges arising from the homicide of Huertas. Cruncleton had previously given a statement to the Wallingford police in which he identified the defendant as the person who shot Huertas. Thereafter, the defendant was arrested on an unrelated charge in San Jose, California, as a result of which he was extradited to Connecticut on the basis of an outstanding arrest warrant for the murder of Huertas.

Six days after the shooting at the Almar Motel, on August 31, 1988, prior to the arrest of either Cruncleton or the defendant, the Wethersfield and Wallingford police executed a search warrant at the Wallingford home of Edwin Oquendo, the defendant's brother. The search warrant was issued for the purpose of locating and seizing the shotgun used in the shooting of Huertas, as well as shotgun shells and small, circular red plastic cap devices. The search warrant was executed shortly after 12 a.m. on August 31, 1988. The search of Edwin's home did not yield the items that

had been sought, but resulted in the seizure of narcotics material. The police asked Edwin if he had any knowledge of the shooting of Huertas, to which he replied affirmatively. Edwin then accompanied the police to the Wethersfield police station at approximately 12 a.m. on August 31, 1988, where he gave a written statement over the course of approximately one and one-half hours. In his statement, which was made under oath, Edwin described the activities of the defendant, Cruncleton and the defendant's girlfriend, Maria Morales, on the early morning of August 25, 1988. Edwin stated that he had seen the defendant retrieve a shotgun from Maria's car. He also stated that he had seen the defendant pry the lock off a tan colored metal box that Maria had removed from the car. Edwin further stated that the box contained a large, thick manila envelope and two plastic bags that appeared to contain cocaine. Edwin also related to the police certain inculpatory statements that he had overheard the defendant make with respect to the shooting at the Almar Hotel.[16]

At the trial of the defendant, Edwin refused to testify.[17] The state sought to have Edwin's statement admitted into evidence through the testimony of John Salvatore, the Wethersfield police detective to whom Edwin had made the statement. The state argued first that the statement was admissible under the principle of *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Alternatively, the state argued that Edwin's statement was admissible under the residual exception

[16] The trial transcript reveals that the state sought to introduce all of the statement concerning inculpatory statements made by the defendant. The trial court ruled, however, that the inculpatory portions of Edwin's written statement were admissible "only insofar as [they] stated those things that the declarant observed and saw."

[17] As a result of Edwin's refusal to testify, the trial court held him in contempt and committed him to the custody of the commissioner of correction.

to the hearsay rule. The defendant objected to the admission of Edwin's statement on the grounds that: (1) *State* v. *Whelan,* supra, was not applicable;[18] (2) the statement did not fall into any recognized exception to the hearsay rule; and (3) admission of the statement would violate his rights to confrontation and cross-examination under the state and federal constitutions.

The trial court concluded that the portion of the statement relating to Edwin's personal observations of the defendant, Cruncleton and Maria Morales on the morning of August 25, 1988 was admissible.[19] In concluding that Edwin's statement was admissible, the court found that the statement was reasonably necessary for the resolution of the case and that it bore sufficient indicia of reliability. See *State* v. *Sharpe,* 195 Conn. 651, 662–66, 491 A.2d 345 (1985).[20] After the trial court

[18] It appears from the transcript that the trial court did not rule on the admissibility of Edwin's statement under *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). In any case, the issue of the statement's admissibility under *Whelan* is not before us in this appeal.

[19] The admitted portion of the statement, which was read to the jury by Salvatore, was as follows: " 'At about six a.m., I woke up to hear Bob [Cruncleton] knocking at the front door. I got up and let Bob inside. I saw Freddy [the defendant] open the hood to Maria's dark blue Chevy, small four-door hatchback. I saw Freddy take the shotgun from somewhere under the hood. Maria got out of the passenger seat, and she gets out holding a tan colored metal box with a combination lock around the handle. Freddy and Bob are real nervous, but Maria just seems her usual self, which seems to be, "I don't give a damn."

" 'Freddy pried the lock off the metal box with a piece of pipe. When it opened, I saw a large manilla envelope which was two inches thick and twelve inches by eight inches. I also saw two freezer-size plastic bags which seemed to be half filled with coke or what I figured was coke. Then Freddy, Bob, and Maria went to Freddy's room. Maria left within ten minutes, and she was carrying her pocketbook. She drove away in her blue Chevrolet.' "

[20] In ruling on the admissibility of Edwin's statement, the trial court stated that it was relying on the language of *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Because *State* v. *Stepney,* supra, contains no language relating to the residual hearsay exception, however, we disregard this reference by the trial court.

ruled that it would admit Edwin's statement through Salvatore, it indicated to defense counsel that the defendant would have the opportunity to cross-examine Edwin regarding the statement. The defendant objected to the procedure proposed by the court. After Salvatore had testified regarding Edwin's statement, Edwin was called to the stand and refused to answer any questions on cross-examination.

The defendant first claims that Edwin's statement was improperly admitted because it did not come within any specific exception to the hearsay rule and did not qualify for admission under the residual exception because it was lacking in the requisite indicia of reliability. The state does not argue that Edwin's statement fell into any of the traditional exceptions to the hearsay rule. Rather, it argues that the statement was properly admitted under the so-called "residual" exception to the hearsay rule. We disagree.

"An out of court statement is hearsay when it is offered to establish the truth of the matters contained therein." *State* v. *Sharpe,* supra, 661. As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. *State* v. *Outlaw,* 216 Conn. 492, 505, 582 A.2d 751 (1990). The purpose behind the hearsay rule is to effectuate "the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination." 2 C. McCormick, Evidence (4th Ed.) § 253. The "residual," or "catch-all," exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is "a reasonable necessity for the admission of the statement," and (2) the statement is "supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions." *State* v. *Sharpe,* supra, 664; see also *State* v. *Outlaw,* supra, 499–50.

The state contends that the trial court properly concluded that Edwin's statement met both requirements of the two-pronged test set forth in *State* v. *Sharpe,* supra. With respect to the first prong of the test, that there be a reasonable necessity for the statement's admission, the state claims that the evidence: (1) was highly probative; (2) could not have been obtained from any other source, as Edwin was the only "neutral" party present to observe the defendant's conduct on the morning of August 25, 1988; and (3) was the only evidence corroborating Cruncleton's testimony regarding the defendant's involvement in the Almar Motel incident.[21] We have stated that "the necessity requirement is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or *otherwise unavailable,* or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Emphasis added.) *State* v. *Sharpe,* supra, 665. In the present case, Edwin was "otherwise unavailable" since he refused to testify at the trial. See *State* v. *DeFreitas,* 179 Conn. 431, 441, 426 A.2d 799 (1980) (although witness present in court, testimony unavailable due to invocation of testimonial privilege); see also 2 C. McCormick, supra, § 253, pp. 131–32 (declarant is unavailable if he persists in refusing to testify despite court order to do so). Accordingly, the trial court properly concluded that the first prong of the *Sharpe* test had been met.

The state argues that the trial court also properly concluded that Edwin's statement met the second prong of the *Sharpe* test. The state claims that the reliability and trustworthiness of the statement were evi-

[21] Prior to the admission of Edwin's statement, Cruncleton had testified that he, the defendant and Maria Morales went to Edwin's house immediately after the shooting of Huertas, bringing with them the shotgun used in the shooting and the metal box containing the cocaine.

denced by the following: (1) Edwin informed the police that he had knowledge of the shooting of Huertas before any contraband was discovered in his home; (2) Edwin's statement was voluntarily given, within five days of the shooting; (3) the statement was based on Edwin's personal observations and he was given time to make corrections before signing it; (4) the statement was made under oath, potentially subjecting Edwin to criminal penalties;[22] (5) Edwin was not in custody when he gave the statement; (6) Edwin's statement tended to inculpate his brother; and (7) the details of Edwin's statement were independently corroborated by Cruncleton's testimony, the testimony of Jose Huertas, the victim's brother, and the defendant's admission to the San Jose police that he had been present at the Almar Motel during the homicide.

The defendant claims that Edwin's statement lacked the requisite indicia of reliability and trustworthiness due to the circumstances under which it was obtained and, therefore, failed to meet the second criteria of the *Sharpe* test. The defendant emphasizes the following circumstances as indicative of the statement's lack of reliability: (1) the search warrant on Edwin's home was executed late at night; (2) the police seized narcotics as a result of the search; (3) Edwin's statement was given after 12 a.m. in a police station in another town; (4) Edwin was at the Wethersfield police station for approximately two and one-half hours; and (5) while at the police station, Edwin saw Cruncleton, who was Edwin's close friend and housemate.[23] The defendant argues that these factors, when viewed together, defeat the state's claim that Edwin's statement was made

---

[22] Pursuant to General Statutes § 53a-180, if Edwin had made a false statement to the police, he would have been guilty of a class A misdemeanor and, thus, could have received a term of imprisonment of up to one year. See General Statutes § 53a-36.

[23] The defendant also claimed in his brief on appeal that Edwin was aware that the affidavit underlying the search warrant alleged that the defend-

under circumstances guaranteeing reliability and trustworthiness. We are persuaded that Edwin's statement did not meet the second prong of the test set forth in *State* v. *Sharpe,* supra, and, accordingly, was improperly admitted by the trial court under the residual hearsay exception.

In *State* v. *Sharpe,* supra, 665, we stated that "[t]he circumstantial probability of trustworthiness and reliability can be found in a variety of situations." In that case, the defendant objected to the admission through a police witness of the out-of-court statement of the victim's neighbor. After learning of the shooting of the victim, the declarant had reported to the police that in the early morning of the day the victim was shot, he had seen an unfamiliar car with two men in it parked near the victim's house. The declarant had given the police the license plate number of the car. We concluded that the proffered hearsay statement was reliable on the basis that the declarant did not know the defendant or the owner of the car, and, therefore, "would have had no reason to offer the police a false statement." Id. In upholding the trial court's admission of the statement, we noted, moreover, that the declarant was a witness at the defendant's trial and, thus, was available for cross-examination.

In contrast to the declarant's statement in *Sharpe,* the circumstances surrounding the giving of Edwin's statement to the Wethersfield police reveal that it "was not imbued with guarantees of reliability and trustworthiness sufficient to support its admission." *State* v. *Outlaw,* supra, 499. First, we reject the state's contention that Edwin "would not incriminate [his brother]

ant had stated to an informant that "his brother from Wallingford" had followed the defendant to the Almar Motel on the night of the murder. In his reply brief, however, the defendant concedes that Edwin was not served with the contents of the affidavit at the time the search warrant was executed.

unless the accusation were true." In view of the facts that the police were seeking the murder weapon in Edwin's house and that they had found narcotics as the result of their search, we cannot say that the circumstances surrounding Edwin's statement "establish a 'motivational basis for truth-telling' equivalent to those associated with the traditional exceptions to the hearsay rule . . . ." Id., 500. In addition, Edwin's close friendship with Cruncleton tends to undermine the trustworthiness of his statement.

Second, unlike the declarant in *Sharpe,* Edwin refused to testify and, therefore, was not " 'a witness at the trial and available for cross-examination.' " *State* v. *Outlaw,* supra, 499, quoting *State* v. *Sharpe,* supra, 665. As we noted in *State* v. *Outlaw,* supra, cross-examination has appropriately been described as " 'the greatest legal engine ever invented for the discovery of truth.' " See 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1367, p. 32. We have consistently stated that "an important function of cross-examination is the exposure of a witness' motivation in testifying." *State* v. *Arline,* 223 Conn. 52, 60, 612 A.2d 755 (1992); see also *State* v. *Lubesky,* 195 Conn. 475, 482, 488 A.2d 1239 (1985). Given the incriminating nature of the evidence contained in Edwin's statement to the police, the defendant's lack of opportunity to cross-examine Edwin regarding his statement further diminished the reliability needed for its admission.

On the basis of the foregoing, we conclude that Salvatore's testimony regarding Edwin's statement was hearsay that did not fall under any exception to the hearsay rule, and, therefore, should have been excluded. Because we conclude that this evidence was inadmissible on the basis that it did not fall within the residual hearsay exception, as set forth in *State* v.

*Sharpe,* supra, we need not reach the defendant's claim that its admission violated his state and federal constitutional rights.[24]

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., and BERDON, J., concurred.

BORDEN, J., with whom CALLAHAN, J., joins, dissenting. I dissent from the majority opinion because I conclude that (1) the police officer, William Birney, had a reasonable and articulable suspicion to make an investigative stop of the defendant, and (2) it is therefore unnecessary and imprudent to reach the question of whether the definition of a "seizure" under article first, § 7,[1] of our state constitution should be determined by the analysis of the United States Supreme Court, under the fourth amendment to the United States constitution, in *California* v. *Hodari D.,* 499 U.S.     , 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). I would, therefore, reject the defendant's first claim on appeal, and would address the remaining claims of trial court impropriety.

As a preliminary matter, I note that, despite the majority's insistence that its threshold inquiry is "at

[24] The defendant raises two additional claims on appeal. First, the defendant claims that the prosecutor, in summation, improperly commented on the defendant's election not to testify, in violation of the defendant's constitutional and statutory right to remain silent. U.S. Const., amend. V, amend. XIV, § 1; General Statutes § 54-84 (a). The defendant's remaining claim is that the trial court improperly instructed the jury on reasonable doubt, in violation of the defendant's right to due process under the fifth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution. Because we conclude that these issues are unlikely to arise on retrial, we decline to consider them.

[1] I am puzzled by the majority's conclusion that "pursuant to article first, §§ 7 *and 9* of the state constitution, there was a seizure." (Emphasis added.) See p. 646 of the majority opinion. Article first, § 7, is, of course, our state counterpart to the federal fourth amendment. Article first, § 9, which provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law," is our criminal due process clause, and has not generally been regarded as adding significantly to search and seizure analysis. See *State* v. *Lamme,* 216 Conn. 172, 579 A.2d 484 (1990).

what point, if any, did the encounter between Birney and the defendant constitute an investigatory stop or seizure," the majority opinion fails to define that point with specificity. I infer, however, that in the defendant's and the majority's view the point of seizure was when, after "Birney asked[2] the defendant to approach the cruiser" and "[t]he defendant handed the duffel bag to Williams and stepped toward Birney," Birney "instructed the defendant to bring the bag with him." See p. 642 of the majority opinion.

It is clear to me that under well established constitutional standards Birney had reasonable and articulable suspicion to justify stopping the defendant and Williams at that point. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[3] In this case, those facts and inferences were as follows.

[2] I also note that, when stating the facts upon which this claim is based, the majority stated that "Birney *asked* the defendant to approach the cruiser." (Emphasis added.) See p. 642 of the majority opinion. When applying its legal analysis to these facts, however, it stated that "Birney *told* the defendant to approach the cruiser." (Emphasis added.) Id., p. 653. As I understand the record, the first formulation is accurate. Moreover, there would ordinarily be a difference between a police officer *asking* and *telling* a citizen to do something, a distinction that may well be relevant to whether the citizen reasonably believed that he was free to disregard the officer's request or order, and therefore relevant to the question of whether there was a seizure.

[3] I also take issue with the majority's scope of review of the trial court's determination of reasonable and articulable suspicion. The majority subjects that determination to a "clearly erroneous" standard of review. I disagree. Although the determination of the underlying facts by the trial court is subject only to the limited, "clearly erroneous" scope of review, the ultimate legal judgment of whether those facts amount to reasonable and articulable suspicion is ultimately a legal determination upon which our scope of review is plenary. See *State* v. *Kyles,* 221 Conn. 643, 660, 607 A.2d 355 (1992).

It was in the middle of a warm, late August night, on a specific street that had recently been the scene of a series of burglaries. All the businesses were closed. When Birney drove past the defendant and Williams in his marked police cruiser, they looked at each other and quickened their pace. Birney knew that Williams, the defendant's companion, had recently been arrested on larceny and burglary charges. Despite the weather and time of year, both the defendant and Williams were inappropriately dressed in winter clothing that Birney knew was the kind of clothing worn by burglars to protect themselves from injury when they break windows. Birney knew that the defendant was not one of the town's street people. When Birney asked them what they were doing, Williams, obviously answering for both of them, lied. They both appeared to be nervous and kept glancing at each other. When Birney asked the defendant to approach the cruiser, the defendant, instead of either walking away or complying with the request with bag in hand, gave the duffel bag to Williams before stepping towards Birney. If all of this is not reasonable and articulable suspicion, I do not know what is.

The majority's analysis attempting to undermine this conclusion is flawed. It consists mainly of supplying a series of possible benign inferences that could have been drawn by Birney from what he saw and confronted at 12:50 a.m. on that warm August night.[4] The problem

---

[4] These inferences are that: Birney had not received a report of any burglary that night in the area, or a report linking the defendant or Williams to any such burglary; homeless people often dress and carry items similar to those of the defendant and Williams; Williams' recent arrest for larceny and burglary supplied no suspicion regarding the defendant; and Williams' lie in response to Birney's question could not provide reasonable suspicion about the defendant's activities. Even on its face, this analysis does not pass muster, in my view.

The fact that Birney had not received a burglary report that night did not in and of itself destroy what is nonetheless reasonable and articulable

with that analysis is that it ignores the equally (at the least) rational inferences that Birney *did* draw from what he saw and heard—inferences that gave him plainly reasonable and articulable suspicion that criminal activity was afoot. Moreover, the fact that Birney characterized his state of mind as a "hunch" is irrelevant. It is axiomatic that the proper standard is objective—namely, what a reasonable police officer in that situation would have concluded—not subjective. See *United States* v. *Clark,* 559 F.2d 420 (5th Cir.), cert. denied, 434 U.S. 969, 98 S. Ct. 516, 54 L. Ed. 2d 457 (1977); 1 W. LaFave & J. Israel, Criminal Procedure § 3.3 (b), p. 188.

There is nothing in *Terry* v. *Ohio,* supra, or any of our precedents following it, that requires that a police officer draw only the benign inferences in favor of the defendant and precludes that officer from drawing rational, incriminatory inferences. Indeed, we have held to the contrary. See *State* v. *Cofield,* 220 Conn. 38, 45, 595 A.2d 1349 (1991), citing *Terry* v. *Ohio,* supra, 21; see also *State* v. *Januszewski,* 182 Conn. 142, 148–49, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). Any other scheme would eviscerate the *Terry* stop doctrine, since on any given set of facts amounting to reasonable and articulable suspicion there would inevitably be different inferences that could have been, but were not, drawn by the police officer.

---

suspicion based on *all* the facts and circumstances available to him, including the series of previous burglaries and Williams' arrest for burglaries. Similarly, the fact that homeless people might dress similarly to the defendant and Williams did not preclude Birney from forming the reasonable suspicion that these two individuals, dressed as they were, acting as they were, in the place that they were, at that time of night, were burglars. Finally, it is simply not accurate to say that Williams' lie cannot be attributed in any way to the defendant. Birney did not ask only Williams what *she* was doing; he asked her "what she *and the defendant* were doing." (Emphasis added.) See p. 641 of the majority opinion. Certainly it was rational and permissible for Birney to infer that her answer was intended for both of them, particularly in the face of the defendant's silence.

The result of this analysis is that, even if we were to adopt the position of the defendant that there had been a seizure in this case, it would avail him nothing, since Birney's activity was not illegal. Therefore, contrary to the conclusion of the majority, the defendant did not run away and discard the bag in response to any police illegality, and the evidence should be admissible.

This also means, moreover, that we should not undertake to decide on this record whether our state constitution requires a definition of "seizure" that is different from and more broad than that applicable under the fourth amendment to our federal constitution.[5] Traditionally, and for sound jurisprudential reasons, we only decide constitutional questions when it is necessary to do so. *State* v. *Rinaldi,* 220 Conn. 345, 353, 599 A.2d 1 (1991). Indeed, in the difficult and delicate area of search and seizure our recent history indicates the wisdom of such state constitutional prudence. Compare *State* v. *Kimbro,* 197 Conn. 219, 238–45, 46, 496 A.2d 498 (1985) (*Shea* and *Callahan, Js.,* dissenting), with *State* v. *Barton,* 219 Conn. 529, 594 A.2d 917 (1991) (overruling *Kimbro*). The majority opinion misapplies the reasonable and articulable suspicion standard, and unwisely ignores this history.

---

[5] Indeed, the majority also misapplies our own precedent in its analysis of article first, § 7. The majority cites *State* v. *Ostroski,* 186 Conn. 287, 291, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982), for the proposition that we "have thus defined a person as 'seized' *under our state constitution* when ' "by means of physical force or a show of authority, his freedom of movement is restrained." ' " (Emphasis added.) See p. 647 of the majority opinion. *Ostroski,* however, decided no such proposition. Although the defendant in *Ostroski* had claimed the protection of article first, § 7, apparently without any independent analysis thereof; *State* v. *Ostroski,* supra, 290; it is clear that the court's analysis was confined to the proposition that the defendant had been seized within the meaning, at that time, of the fourth amendment. Thus, there was no occasion for the court in *Ostroski* to discuss the state constitution. Id., pp. 291–94.