[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] -A- MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO SUPPRESS
 I INTRODUCTION
The Court orally ruled September 6, 2000 on the motions to suppress filed by the defendant. The following represents the corresponding Memorandum of Decision. CT Page 12142-ag
The defendant, Ivo Colon (Defendant) through his attorneys filed a motion to suppress any and all potential testimony or other evidence obtained in violation of the defendant's rights under the fourth, fifth
and fourteenth amendments to the United states constitution and article first, §§ 7, S and 9, of the constitution of the State of Connecticut. The defendant has also filed a motion to suppress any statements of the defendant that were obtained in violation of the defendant's rights under the fourth, fifth, sixth, andfourteenth
amendments of the United States constitution, and article first, §§1, 7, 8, 9 and 20 of the Connecticut constitution.
The Court conducted an evidentiary hearing on August 29, 30, and 31, 2000, which by agreement of the parties addressed the defendant's two motions to suppress. The defendant's motion to suppress tangible property from the person of the defendant is also addressed by the Court's four corner review of the affidavit in support of the search warrant (State's Exhibit #9)[1]
The Court heard testimony at this hearing from Captain Kathleen Wilson (retired), Lt. Neil O'Leary, Detective Randolph Velez, Rachel Norville, Lt. Michael Ricci, Detective John Kennelly, Officer John Gugliotti, Officer William Cassada, Detective William Howard Jones, Detective David Balnis, Officer' James Olivero, Lillian Quinnones, and Jennifer Morales.
The defendant's statements which are the subjecc of the motion to suppress are:
(A) defendant's oral statement to Lt. Ricci through Detective Velez;
(B) defendant's written statement to Ld. Ricci, through Detective Velez (State's Exhibit #1)
(C) defendant's written statement to Lt. Ricci through Detective Velez (State's Exhibit #2) ; and
(D) defendant!.s written statements to Detective Kennelly, through Deteccive Velez (State's Exhibit #7 and #8)
The property that is the subject of the motion to suppress is included within the inventory of the search warrant (State's Exhibit #9)
 II Factual Backoround
CT Page 12142-ah
At the suppression hearing, the Court heard testimony and received documentary evidence concerning the events of July 17, 18 and 19, 1998. Before turning to the specific issues of the defendant's motions, the Court will review the evidence which the Court found credible.
On July 17, 1998, the deceased, Keriana Tellado, was presented at St. "Mary's Hospital. At or about 7 p.m., members of the Waterbury Police Department, including Lt. Neil O'Leary and Captain Kathleen Wilson, reported to St. Mary's Hospital to investigate the death of the child. Both Lt. O'Leary and Captain Wilson viewed the badly bruised body of the child. Lt. O'Leary discussed the circumstances of the child's injuries and death with the child's mother, Virginia Quintero. Medical personnel indicated to Lt. O'Leary that they were uncomfortable with the history received concerning the child's injuries and death. Virginia Quintero went to the Waterbury Police Department, where she was interviewed by Lt. O'Leary and Detective Howard Jones. They received information that the defendant, lye Colon, the boyfriend of Quintero, was out of the country. Further investigation established that Ivo Colon was not out of the country, but at 418 Mill Street, Waterbury, and possibly with a young child who was a sibling of the deceased. This other child was reported as "taken" from 632 South Main Street. At that time, Lt. O'Leary knew nothing about Ivo Colon, but was presented with (1) a severely injured child who had died as a result of these injuries; (2) representations that did not coincide with the injuries on the child; (3) the name of Ivo Colon who had some relationship with Virginia Quintero and had been introduced into these investigations; and (4) the present location of Ivo Colon contradicted.
With this information, Lt. O'Leary went to 418 Mill Street with other police personnel, to locate' Ivo Colon and the other child, who was later learned to be named Crystal Tellado. A plan was established which sent Officer David Balnis and Captain Kathleen Wilson at the back door and Lt. Neil O'Leary, Officer Tony Olivera, Officer Randolph Velez at the front door of the apartment. Officer Randolph Velez was and is Spanish speaking. Lt. O'Leary's testimony indicated that upon getting to the top floor of the apartment, he heard a child crying and heard someone running in the apartment. Lt. O'Leary knocked on the door, with no response. Officer Velez announced in Spanish, "Police". There was no response. They waited a very short time, and kicked in the door. Upon entry, they saw a male running down the hall, and heard a child crying. Captain Wilson was let in, and her testimony is that she went directly to the child, who was about three years old, and observed "a lot of what appeared to be fresh bruises on the legs". She further testified that the child appeared CT Page 12142-ai scared. Captain Wilson asked Crystal, in English and some Spanish, who did this. The child responded "lye did it." Ivo Colon was grabbed by Officer Velez by his arm to keep him from going into the bedroom. Lt. O'Leary attempted to speak to Ivo Colon in English, but it appeared to him that he wasn't responding, so Officer Velez translated in Spanish from Lt. O'Leary to Ivo Colon and in English from Ivo Colon to Lt. O'Leary. Lt. O'Leary testified that he told Ivo Colon through Officer Velez that he was there to talk to him about the injuries to Keriana Tellado and that he asked him to come to the police station. The testimony was that Ivo Colon nodded his head in the affirmative and responded in English. The testimony presented was that there were no guns drawn by police personnel. Crystal Tellado was taken to the hospital by ambulance and Ivo Colon was taken to the Waterbury Police station in a police vehicle. There were three police personnel and Colon in the vehicle. Officer Velez and Colon were in the back seat. There were no cages between front and back seat. There were no discussions between lye Colon and police personnel at the apartment or during his transportation to the police department. The credible evidence established that the defendant was not handcuffed at the apartment and during his transportation to the police department.
At the police station, at approximately 9 p.m., the defendant was put into an interview room which had a table and a computer. There are no locks on the doors' to the interview room, which opens into the detective bureau area. Lt. Michael Ricci conducted discussions with the defendant, and Officer Velez was instructed to translate for the defendant and Lt. Ricci. The testimony presented that the defendant, when put into the interview room, was advised in Spanish by Officer Velez of his constitutional rights as established in Miranda[2]. He was presented with those rights on the interview card, (States Exhibit #3) which are both in English and Spanish, which Officer Velez read to him. Officer Velez testified that he asked the defendant if he understood his rights, the defendant said yes, and if he was willing to waive those rights and answer questions, and he said yes. After the oral waiver of his rights, Officer Velez requested that the defendant sign the card and date it on the Spanish side. After signing the advisement card, Lt. Ricci asked the defendant questions translated by Officer Velez, which addressed if he knew the cause of Keriana Tellado's injuries. He responded that the child had fallen down the stairs. These questions were asked repeatedly.
Lt. Ricci testified that the defendant's demeanor was quiet and calm, and during the course of the time that the defendant was there he had eaten a meatball grinder and drank a soda. The police denied that the defendant was abused or threatened while at the police station. Lt. CT Page 12142-aj O'Leary was moving between the interviews of Virginia Quintero and the defendant. At approximately 11 p.m. on July 17, 1998. Lt. O'Leary relayed to Lt. Ricci that Virginia Quintero had implicated the defendant in the homicide of Keriana Tellado, and to convey that to the defendant. Lt. Ricci testified that when presented with this information, the defendant said he was going to tell the truth.
 Oral Statement
The defendant then through Officer Velez orally stated how he had hurt the child, including hitting the child with rings, belts and striking her head against the wall. Lt. Ricci and Officer Velez did not view the child's body at the hospital The defendant was then handcuffed to the chair.
 Written Statement — I
After the defendant gave the oral statement, Lt. Ricci reduced that statement to writing. The process utilized was that the defendant was advised of his rights pursuant to Miranda, these advisements were on the top of the statement. They were translated to the defendant in Spanish by Officer Velez. After each sentence of rights were read and translated to him, he initialed them "IC". Then Lt. Ricci would ask questions, Officer Velez would translate in Spanish to Colon, Colon responded to Velez in Spanish and Velez translated. in English to Ricci who typed it into the computer. Officer Velez viewed the statement as typed on the screen. When completed, Officer Valez read the written statement in Spanish to Colon. Colon was asked if any changes should be made — he responded no. He was also asked if it was the truth, he responded yes. The original statement was signed by the defendant and notarized by Lt. O'Leary.
 Written Statement — II
At approximately 4:30 a.m. on July 18, 1998, another written statement was taken from the defendant. Officer Velez advised the defendant in Spanish of his constitutional rights using the Miranda warning card, both in Spanish and English (State's Exhibit #4). Officer Velez testified that he read from the advisement card to the defendant in Spanish, and asked the defendant to read the card back to him. The defendant waived his rights and signed his name and dated the caret. The defendant also was presented with the statement form with the Miranda rights printed on the top portion of the form. The rights were read to him in Spanish. After each sentence he was asked in Spanish if he understood. If the defendant answered yes, Colon wrote his initials next to the sentence. The CT Page 12142-ak defendant initialed each right with "IC". Lt. Ricci put the statement foam in the computer. Lt. Ricci would ask questions to the defendant translated by Officer Velez to the defendant. The defendant would answer in Spanish to Officer Velez who would translate in English to Lt. Ricci, who would type it into the computer. The defendant discussed assaults upon Virginia Quintero and Crystal Tellado. After typing the statement, the defendant was read the statement in Spanish "and asked if he wanted to make any changes. The defendant said it was the truth and signed the statement. It was notarized by Lt. O'Leary. This statement was completed at about 5 a.m. This statement was admitted as State's Exhibit #2. The testimony presented the defendant's demeanor again as quiet and calm.
 Written Statement — III
The testimony presented at the hearing was that the defendant escaped from the Waterbury Police Department sometime on July 18, 1998. The defendant left his cell, took the elevator and exited near the detective bureau out the back of the police station. The defendant was apprehended at approximately 10 p.m. on July 19, 1998. When apprehended, Colon was placed under arrest for Escape in the First Degree, handcuffed and brought to the police station. At the police station, he was placed in an interview room (previously described). Once in the interview room, the defendant was advised in Spanish of his rights, per Miranda, by Officer Velez (from the Miranda card State's Exhibit #5). The defendant indicated that he understood those rights. The defendant waived his rights and signed his name and dated the card. The defendant was also presented with the statement form with the Miranda rights. These advisements were on the top portion of the statement form. Officer Velez read the rights in Spanish to the defendant, asked the defendant if he understood them and wished to waive them, and asked the defendant to initial them "IC". The defendant put the initials "IC". Officer Velez translated into Spanish questions that Detective Kennelly asked the defendant in English. The defendant would respond in Spanish to Officer Velez; Officer Velez would translate in English to Detective Kennelly. The defendant spoke of the escape from the police department. Detective Kennelly typed what was presented to him into the computer. The defendant was asked if he wanted to make any changes, he said that he did not want to make any changes, and it was the truth. The statement was signed by the defendant and notarized. This statement was admitted as State's Exhibit #7 and State's Exhibit #8.
 III (A) Entry Into 418 Mill Street, Waterbury
CT Page 12142-al
The defendant alleges that he had been illegally seized (1) under article first, § 7, of the State's constitution; (2) under thefourth amendment to the Federal constitution, when Waterbury police personnel entered 418 Mill Street, Waterbury at approximately 8 p.m. on July 17, 1998 and escorted him to the police station.
"It is well settled [law] that [i]f the police obtain physical evidence "or statements as the result of the seizure of a person without probable cause in violation of the constitution of Connecticut, article first, §§ 7 and 9, [or the fourth amendment to the United States constitution] the fruit of the poisonous tree doctrine requires the evidence be suppressed as a product of the unlawful seizure. . . ." (Citations omitted; internal quotation marks omitted.) State v. James,237 Conn. 390, 404, 678 A.2d 1338 (1996); State v. Greenfield,228 Conn. 62, 67, 634 A.2d 879 (1993)
Before addressing the issue of whether there was a seizure" of the defendant, the Court addressed the entry into 418 Mill Street by police personnel. As previously indicated, while at the front door of 418 Mill Street, Lt. O'Leary and Officer Velez "kicked in" the door to gain entry into the apartment. This occurred after they announced in both English and Spanish that they were the police and received no response. Lt. O'Leary testified that based upon his concern for the safety of the young child, Crystal, he entered the apartment. Lt. O'Leary also had viewed the deceased child's body, and had received information that Ivo Colon was not out of the country and had taken the young child (Crystal) to the Mill Street apartment.
"[A] search conducted without a warrant issued upon probable cause is per se unreasonable. . . . subject only to a few specifically established and well-delineated exceptions. . . ." (Citations omitted; internal quotation marks omitted.) State v. Trine, 236 Conn. 216, 235, 673 A.2d 1098
(1996); State v. Magnano, 204 Conn. 259, 265, 528 A.2d 760 (1987). Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. State v. Geisler, 222 Conn. 672, 690-91,610 A.2d 1225 (1992); State v. Magnano, supra, 265-66; State v. Klauss,19 Conn. App. 296, 299-301, 562 A.2d 558 (1989). "[T]he fourth amendment does not bar police officers, when responding to emergencies from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid . . . The extent of the search is limited, involving a prompt warrantless search of the area to see if there are other victims or if a killer is CT Page 12142-am still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . ." (Citations omitted; internal quotation marks omitted.) State v. Geisler, supra, 691.
"The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. Mincey v. Arizona, 437 U.S. 385,390-91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. State v. Geisler, supra, [222 Conn.] 692; State v. Guertin,190 Conn. 440, 453, 461 A.2d 963 (1963). [The police] must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings. . . . The test is not whether the officers actually believed that an emergency ex=ted but whether a reasonable officer would have believed that such an emergency existed. . . . State v. Geisler, supra, 692. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry . ." (Citations omitted; internal quotation marks omitted.) State v. Blades,225 Conn. 609, 618-19; see also State v. Hoth, 50 Conn. App. 77, 84,718 A.2d 28, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998)
Lt. O'Leary testified that at the time of entry he had viewed the body of the deceased child, Keriana Tellado, and the nature and type of injuries she sustained. Furthermore, he discussed with the deceased child's mother, Virginia Quintero, the purported cause of those injuries. Both Lt. O'Leary and medical personnel opined that Quintero's explanation of the cause of the child's injuries was not plausible. Additionally, Lt. O'Leary received information that the deceased's sibling was with the defendant Colon at an unknown location after being abruptly taken by Ivo Colon. Lt. O'Leary had also received inconsistent information about the whereabouts of Colon. When Lt. O'Leary arrived at 418 Mill Street, he heard a child crying, an older person's footsteps running about the apartment and there was no response to his knock and verbal call of police, both in English and Spanish. This information was known to Lt. O'Leary at the time of entry.
The Court finds Lt. O'Leary's testimony credible, and that based upon the information known to him at the time of the entry, it was reasonable for him to believe that an emergency existed involving potential harm to a young child's health. The Court finds that the State has sustained its burden of proof to show that the emergency exception exists. State v.Blades, supra, 225 Conn. 618-19; State v. Hoth, supra, 50 Conn. App. 77. CT Page 12142-an The Court finds that the entry was not illegal.
 (B) Voluntary Interactions vs. Lecal Seizure
The defendant claims that he was illegally seized from 418 Mill Street, Waterbury, in that there was no warrant or probable cause to seize him at that location.
The defendant asserts that "[i]f the police obtain physical evidence or statements as the result of the seizure of a persons without probable cause, in violation of the constitution c: Connecticut, article first, §§ 7 and 9, for the fourth amendment to the United States constitution] the "fruit of the poisonous tree' doctrine requires that the evidence be suppressed as the product of the unlawful seizure. . . ." (Citations omitted.) State v. James, supra, 237 Conn. 404.
"[A] two-part analysis is required." Id. First, the court must determine whether the defendant was seized. Id. If so, the court must then find that there was probable cause for the seizure. Id.
In determining the question of whether there has been a seizure, applying an objective standard, the Court reviews the police conduct at the time of the alleged seizure." Id. "We have. . . . defined a person as seized under our state constitution when by means of physical' force or a snow of authority, his freedom of movement is restrained. . . . State v.Oquendo, 223 Conn. 635, 647, 613 A.2d 1300 (1992)." State v. James, supra, 237 Conn. 404.
"Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free :o leave." State v. Pinder,250 Conn. 385, 409, 735 A.2d 857 (1999) ; State v. James, supra,237 Conn. 404, citing United States v. Mendenhall, 446 U.S. 544, 553-54,100 S.Ct. 1870 64 L.Ed.2d 497. reh. denied, 448 U.S. 908,100 S.Ct. 3051,65 L.Ed.2d 1138 (1980); State v. Oquendo, supra, 223 Conn. 647.
"A person is not arrested or seized [however]. . . . if he freely chooses to enter into or continue an encounter with the police. UnitedStates v. Brunson, 549 F.2d 348, 357 (5th Cir. 1977), cert. denied,434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977)." State v. James, supra237 Conn. 405.
In determining whether a defendant's encounter with the police was CT Page 12142-ao consensual in nature, the court may consider factors such as: "the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor in requesting the defendant to accompany him to the police station; the officer's statements to others who were present during the encounter; the manner in which the defendant was escorted out of the [apartment] and transported to the stationhouse; the officer's response to any questions by the defendant. . . . reqarding the defendant's right to refuse to go to the stationhouse; and the defendant's verbal or non verbal resnonse to any directions given to him by the officer" State v. James, supra,237 Conn. 405.
Reviewing the testimony which the Court finds credible, the police went to 418 Mill Street based on the nature of the information of the decedent's injuries and information provided by other officers, hospital personnel and the victim's mother. The police entered the apartment. The police confronted the defendant moving down a hallway. When he was asked in English and then in Spanish if he would come to the police station to discuss Keriana Tellado's injuries he nodded "yes." There were no guns drawn, or any evidence of threats, or physical force.[3] The evidence that the Court finds credible is that the defendant was not handcuffed. He was placed in an unmarked police cruiser, without a cage and taken to police headquarters. The defendant's demeanor was calm and under control. Although the police did not tell the defendant he could refuse to go to the police station, he did not object or request to go to the police station at another time. The Court is not persuaded by the defendant's argument that under the totality of the circumstances, a reasonable person could not freely make a choice to accompany the police when confronted with the forced entry and the presence of the police.
In light of the totality of the credible evidence, the Court finds that the defendant was not seized by the police at 418 Mill Street, Waterbury on July 17, 1998, but rather voluntarily agreed to accompany the police to the station for further questioning. Accordingly, the Court finds that the first prong as set forth in State v. James, supra, 237 Conn. 404, has not been met and thus the defendant was not illegally seized.
Additionally, the Court further considered the evidence presented in a light that a seizure of the defendant did occur at 418 Mill Street by the police.
After entry into 418 Mill Street, Captain Wilson held and examined the body of the young child that was crying and appeared scared in the apartment. Her testimony was that she saw "bruises all over her body." CT Page 12142-ap Captain Wilson asked the child in Spanish who did this, and she responded "Ivo did it".
An ambulance was called to transport the child to the hospital. Rachel Norville, the EMT paramedic who transported the child to the hospital, testified that she had an opportunity to view the child, and saw "lots of bruises" in all different stages, some were "fresh". Lt. O'Leary testified that in the apartment, he saw the injuries to Crystal Tellado, and had this information from Captain Wilson. Based upon this information, the police had probable cause to arrest the defendant for a felony.
Therefore, even if the Court found that a "seizure" of the defendant did occur, and an illegal seizure did not take place because there existed probable cause for the seizure. See State v. James, supra,237 Conn. 404.
 IV Statements Made By the Defendant to Officer Velez and Lt. Ricci
The defendant claims that the oral and written statements made by the defendant about the injuries to Keriana Tellado and the written statement addressing the assaults upon Virginia Quintero and Crystal Tellado should be suppressed. The basis of the defendant's claim is that the statements were taken:
(i) in violation of the defendant's rights against self-incrimination in violation of the fifth and fourteenth amendments to the United States constitution and article first § 8, of the Connecticut constitution; and/or
(ii) without the defendant having made a knowing and voluntary waiver of his rights to remain silent in violation of the rule of Miranda v.Arizona; and/or
(iii) in violation of the defendant's right to counsel in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution; and/or
(iv) are a product of a prior illegal seizure; and
(v) were not voluntary in violation of the defendant's rights to due process under the fifth and fourteenth amendments to the United States CT Page 12142-aq constitution and article first, § 8 and 9, of the Connecticut constitution.
The Court first addresses the oral and written statements given by the defendant to Lt. Ricci as translated from the defendant by Officer Velez.
 (a) Oral Statement
The defendant was brought into the Police Department Detective Division sometime between 8:30 p.m. and 9 p.m. on July 17, 1998. He was presented in an interview room, with Lt. Ricci and Officer Velez at approximately 9 p.m. The defendant was read his rights from the Miranda card in Spanish by Officer Velez. The defendant then read his Miranda rights from that card which included the defendant's right against self incrimination and the right to have an attorney present before being questioned. When asked if he understood and wished to waive these rights, he said yes and signed his name on the card. The defendant was asked questions concerning the injuries to Keriana Tellado.
Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by Miranda: (1) the defendant must have been in custody and (2) the defendant must have been subjected to police interrogation. State v. Pinder, supra, 250 Conn. 408-09.
The State is not contesting that at the time of giving the statements, the defendant was in custody. Lt. Ricci advised the defendant of his rights, pursuant to Miranda.
Having heard the rights in Spanish, the defendant indicated he understood his rights and he waived them.
(i) Self Incrimination:
The defendant was advised in Spanish of this right. He indicated that he understood this right and waived it. There was no evidence that he failed to comprehend or did not voluntarily waive this right. Additionally, the defendant did not refuse or cease to speak to the police. After reading the advisement of rights card, the defendant signed it.
(ii) Right to Remain Silent
The defendant was advised in Spanish of this right. He indicated that CT Page 12142-ar he understood this right and would waive
it. Officer Velez translated for the defendant as he spoke to Lt. Ricci. There is no evidence that the defendant attempted to stop speaking with police personnel. After reading the advisement of rights card, the defendant signed it.
(iii) Right to Counsel
 The defendant was advised in Spanish of his right to counsel, and his right to consult with a lawyer before questioning. The police also advised the defendant of his right to have-counsel appointed if he could not afford an attorney, before questioning. The credible evidence shows that the defendant was advised of this right in Spanish, and that he understood and waived it. There is no evidence that the defendant asked for an attorney or requested the use of the telephone to contact an attorney.
The defendant proceeded to give an oral statement to Lt. Ricci and Officer Velez concerning his involvement with the injuries to Keriana Tellado.
The Court finds that the defendant knowingly and voluntarily continued to answer the officers' questions. Throughout the time that the defendant was with the officers, he was not under the influence of alcohol and/or drugs, he was lucid, communicative and responsive. He appeared to have sufficient mental and intellectual capacity to comprehend the advisements, waiver and the questions propounded. See State v. Santiago,245 Conn. 301, 320, 715 A.2d 1 (1998)
"The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his Miranda rights, including his right to remain silent . . . . [T]he state must demonstrate: (1) that the defendant understood his rights, and (2) that the defendant's course of conduct indicated that he did, in fact, waive those rights. . . . In considering the validity of [a] waiver, we look. . . .to the totality of the circumstances of the claimed waiver. The determination of [w]hether a defendant has knowingly and intelligently waived his rights under Miranda depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. To determine whether an individual had the capacity to understand the warnings, the trial court may consider: the defendants experience with the police and familiarity with the warnings, CT Page 12142-as his level of education, his intelligence including his IQ, his vocabulary and ability to read and write in the language in which the warnings were given, his age, intoxication, his emotional state and the existence of any mental disease, disorder or retardation." (Citations omitted; internal quotation marks omitted.) State v. Santiago, 245 Conn. 301 321,715 A.2d 1 (1998)
The Court finds that the State has sustained its burden of proof that the defehdant was advised in Spanish of his Miranda rights and that he read the Spanish version of the advisement of rights card.
The Oral Statement was a Product of an Illeaal Seizure
The Court ruled that the evidence established that the defendant was not illegally seized.
The Statement was not Voluntarily and Knowingly Made
The defendant claimed that his oral statement was not voluntarily made.
"[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . ." (Citations omitted; internal quotation marks omitted.) State v.Pinder, "supra, 250 Conn. 418.
In order to be voluntary, a statement must be the product of an essentially free and unconstrained choice by its maker. Id. "If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the [statement] offends due process." Id. 418-19; State v. James, supra, 237 Conn. 410-11.
The determination of whether a confession is voluntary must be based on a consideration of the totality of the circumstances surrounding it.State v. Pinder, supra, 250 Conn. 418. "Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and" prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . State V.Madera, 210 Conn. 22, 41, 554 A.2d 263 (1989); see also, State v.Shifflett, 199 Conn. 718, 728, 508 A.2d 748 (1986); State v. Pinder, supra, 419. CT Page 12142-at
When the defendant arrived at the police station, he was placed in an interview room and advised in Spanish of his Miranda rights. Colon indicated that he understood those rights and signed the rights advisement card. (State's Exhibit #3) This was approximately 9 p.m. The defendant, upon the initial questioning, presented his version of the events to cause the injury to Keriana Tellado. Between 9 p.m. and 11 p.m., the defendant was questioned, ate food and drank a beverage. There were some breaks in the questioning. He did not ask to leave the station or speak to an attorney. There is no testimony or indication that the defendant was distraught. His demeanor was calm. This was consistent with his demeanor at 418 Mill Street, when he was not crying or upset. At approximately 11 p.m., the defendant learned that Virginia Quintero had implicated him in the death of Keriana Tellado. Shortly after this, the defendant gave an oral statement to Lt. Ricci about his involvement in Keriana Tellado's death.
The defendant gave this oral statement after he learned that Virginia Quintero had implicated him in the death of Keriana Tellado. There was no evidence of threats, physical abuse, or deprivation of food or drink by the police. This indicates to the Court that the defendant did "not give the oral statement because his will to remain silent was overborne, but rather that he confessed of his own free will.
The Court finds after consideration of the totality of the circumstances, that-the State has sustained its burden of proof by the evidence that the defendant's oral statement to Lt. Ricci, translated by Officer Velez, was voluntary.
 (b) Written Statement
Re: Keriana Tellado
The testimony established at the motion to suppress hearing was that after the defendant gave an oral statement about his involvement with the injuries to Keriana Tellado, he was handcuffed to the chair.
Lt. Ricci then prepared to take a written statement from the defendant. This commenced at approximately 1 a.m. on July 18 1998. The testimony established that Lt. Ricci was with Officer Velez and the defendant in the interview room. Ricci advised the defendant through Officer Velez what was occurring He presented the written statement form to the defendant, which has on the upper portion the Miranda rights. The testimony establishes that Officer Velez translated "those rights in CT Page 12142-au Spanish to the defendant and asked him if he understood them. Officer Velez instructed the defendant to place his initials next to each sentence on the rights card if he wished to waive the rights. The defendant wrote "IC" next to each sentence of the rights card.
With regard to the statement, Officer Velez translated into Spanish the questions that Lt. Ricci asked the defendant and into English the defendant's responses. Lt. Ricci typed the responses on the computer nearly contemporaneously. When the defendant concluded giving his statement, Officer Velez read the statement to him in Spanish. The defendant signed the statement after indicating that the statement was true and that he did not wish to make any changes. Colon had been previously advised of his Miranda rights, in Spanish, from the advisement of rights card (State's Exhibit #3)
(i) Self Incrimination
 The defendant was advised in Spanish of this right. He indicated that he understood the right and waived it. There was no evidence that the defendant failed to comprehend or did not voluntarily waive this right. Additionally, the defendant did not refuse or cease to speak to the police. After reading that right, he initialed "IC" to this right.
(ii) Right to Remain Silent
 The defendant was advised in Spanish of this right. He indicated that he understood this right and waived it. The defendant did speak to Lt. Ricci as translated by Officer Velez. There was no evidence that the defendant attempted to stop speaking with police personnel. After reading that right, the defendant initialed "IC" the sentence of that right.
(iii) Right to Counsel
 The defendant was advised of his right to counsel and of his right to consult with an attorney before questioning. The police also advised the defendant of his right to have counsel appointed if he could not afford an attorney before questioning. The credible evidence shows that the defendant was advised in Spanish of this right, and that he understood this right and waived it. There is no evidence that the defendant asked for an attorney or requested the use of the telephone to contact an attorney, or that he did not understand this right. After reading "the advisement of right to counsel, the defendant placed his initials ("IC") to this right.
CT Page 12142-av
The Court finds that the State has sustained its burden of proof that the defendant was advised in Spanish of his Miranda rights, and that he read the Spanish version of the advisements and initialed them. Moreover, the defendant knowingly and voluntarily waived these rights. The defendant, when questioned in Spanish if these statements were true, he said yes.
The Written Statement was a Product of an Illegal Seizure
 The Court previously ruled that the defendant was not illegally seized.
The Statement was not Voluntarily and Knowingly Made
Reference is made to Section C(a)(v) addressing the law and factors concerning whether a statement is knowingly and voluntarily made. That section is incorporated by reference herein.
The process of taking the written statement commenced at approximately 1 a.m. on July 18. 1998 and went to 3 a.m.
The process of taking the statement has been previously indicated. This process took almost two hours. There is no indication that this length of time overbore the defendant's will or had any causal relationship to the defendant giving this written statement.
Considering the totality of the circumstances surrounding the defendant's giving of the written statement, the conduct of the police clearly did not overbear the defendant's will to resist and bring about the statement. The State has sustained its burden of proof that the defendant's written statement to Lt. Ricci and Officer Velez on July 17-18, 1998 was voluntarily made and not the product of police coercion.
 (C) Written Statement Re: Virginia Quintero and Crystal Tellado (State's Exhibit #2)
The credible evidence established that at approximately 4:30 a.m. on July 18, 1998, Lt. Ricci with the translation of Officer Velez, proceeded to receive a written statement from the defendant.
This statement discussed the defendant's conduct with Virginia Quintero CT Page 12142-aw and Crystal Tellado. Lt. Ricci and Officer Velez took the defendant's statement in the same manner as the previous statements. The Court finds the credible evidence establishes the defendant was read his Miranda
rights first from the advisement of rights card (State's Exhibit #4), in Spanish by Officer Velez. The defendant indicated he understood these rights. The defendant waived his rights and signed his name and date to the card. The defendant was also presented with the statement form with the Miranda rights located on the upper portion. The defendant was read those rights in Spanish. :he defendant indicated that he understood and waived these rights. The defendant initialed "IC" after each Miranda
right.
Officer Velez translated into Spanish the questions that Lt. Ricci asked the defendant, and into English the defendant's responses. Lt. Ricci typed these responses onto the computer nearly contemporaneously. When the defendant concluded giving his statement, Officer Velez read the statement to him in Spanish. The defendant did not ask for any changes to be made. The defendant signed the statement (State's Exhibit #2). The statement-taking process started at 4:30 a.m. and ended about S a.m. on July 18, 1998.
(i) Self-Incrimination
 The defendant was advised in Spanish of this right. He indicated that he understood the right and waived it. There was no evidence that he failed to comprehend or did. not voluntarily waive this right. Additionally, the defendant did not refuse or cease to speak to the police. After reading the advisement of rights card, the defendant signed it, and after being translated the statement form's advisement of rights, he indicated he understood it and initialed "IC" next to that right.
(ii) Right to Remain Silent
The defendant was advised in Spanish of this right. Colon indicated that he understood this right and waived it. Officer Velez translated for the defendant as he spoke to Lt. Ricci. There is no evidence that the defendant attempted to stop speaking with police personnel. After reading the advisement of rights card, the defendant signed it, and after being translated the statement form's advisement of rights, he indicated he understood it and initialed "IC" next to that right.
(iii) Right to Counsel
CT Page 12142-ax
 The defendant was advised of his right to counsel, and his right to consult with counsel before questioning. The police also advised the defendant of his right to have counsel appointed and present while being questioned if he could not afford an attorney. The credible evidence shows that the defendant was advised in Spanish of this right and that he understood and waived it. There is no evidence that the defendant asked for an attorney, or requested the use of the telephone to contact' an attorney, or that he did not understand this right. After reading the advisement of rights card, the defendant signed it, and after being translated the statement form's advisement of rights, he' indicated he understood it and initialed "IC" next to that right.
After a consideration of all of the evidence, the Court finds that the State has sustained its burden of proof that the defendant was advised in Spanish of his Miranda rights, and that he read the Spanish version of the advisement of rights card, and the advisement of rights in the statement and that he initialed "IC" after each right. Moreover, the Court finds the waiver to be knowingly and voluntarily made.
The Written Statement was a Product of an Illeaal Seizure
 The Court ruled that the evidence established that the defendant was not illegally seized.
 Statement was not Voluntarily and Knowingly Made
 The defendant claims that this second written statement was not voluntarily made. Reference is made to section C(a)(v) addressing the law and facts concerning whether a statement is knowingly and voluntarily made. That section is incorporated by reference herein.
 The Court considers the credible evidence established concerning the taking of the written statement. The statement process started at approximately 4:30 a.m. and went to B a.m. The police utilized the same process they had for the previous statements. The Court considers this statement-taking process with the previous statements taken. The defendant gave the statement after he had CT Page 12142-ay learned that Virginia Quintero had implicated him in the injuries to the children and Virginia Quintero. There was no evidence of threats, physical abuse, or deprivation of food and drink by the police. Moreover, there were periods of time that the defendant was alone in the room.
 Therefore, the Court finds, that the State sustained its burden of proof that the defendant's confession was voluntary and that the conduct of the police did not overbear the defendant's will to resist in bringing about the statement.
 In consideration of all the defendant's statements given to Lt. Ricci and Officer Velez, the Court has considered the time that the defendant was with the police, from approximately 8:30 p.m. on July 17, 1998 to 5 a.m. on July 18, 1998-. The mere fact that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary. State v. Lapointe, 237 Conn. 694, 734, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S.Ct. 484, 136 L.Ed.2d 378 (1996) ; State v. DeAngelis, 200 Conn. 224, 235, 511 A.2d 310 (1986). In light of' all the circumstances, the Court does not find the length of time to be unreasonable or overbearing.
 (D) Defendant's Statement to Detective Kennelly (Escape)
The evidence produced at the motion to suppress hearing established that during the period of time that the defendant was at the Waterbury Police Department, he escaped from the cell block area and left the police station. He was later apprehended during the late evening hours of July 19, to early morning hours of July 20, 1998. At the time of his escape, the defendant was under arrest for the murder of Keriana Tellado.
The police apprehended him and brought him to the police station. At the police station, the defendant was advised in Spanish of his rights and gave a written statement to Detective Kennelly concerning his escape. CT Page 12142-az
The defendant moved to suppress this statement on the same grounds as he has moved to suppress the previously discussed statements.
The evidence established that police personnel placed the defendant in an interview room with Officer Velez and Detective Kennelly. The testimony established that once in the interview room, Officer Velez advised the defendant in Spanish of his Miranda rights from the advisement of rights card (State's Exhibit #5). The defendant was read those rights in Spanish. Colon indicated he understood those rights, and wished to waive them. Colon signed and dated this advisement of rights card. Colon was also presented with the Miranda rights on the top portion of the statement form. The defendant was read these rights in Spanish. Officer Velez instructed him to place his initials next to each of the rights as' they appeared on the statement form, if the defendant understood the rights. The defendant complied with this request by initialing each right with "IC"
Detective Kennelly and Officer Velez utilized the same procedures to take the statement as Officer Velez and Detective Ricci had previously utilized. Officer Velez translated into Spanish the questions that Detective Kennelly asked the defendant and into English the defendant's responses. Detective Kennelly typed the responses on the computer almost contemporaneously. When' the defendant concluded giving his statement, Officer Velez read it to him in Spanish. The defendant was asked if he wanted to make any changes which he stated he did not, and Officer Valez asked him if it was the truth, he responded yes. The defendant signed and Lt. O'Leary notarized the statement. (State's Exhibit #7 and #8)
As to the claims of the defendant:
(i) Self Incrimination
 The defendant was advised in Spanish of this right. He indicated that he understood this right and waived it. There was no evidence that he failed to comprehend or did not voluntarily waive this right. Additionally, the defendant did not refuse or cease to speak to the officers. After having had the rights read to him in Spanish from the advisement of rights card the defendant signed it and after being translated the statement form's advisement of rights, he indicated he understood it and he initialed "IC" next to each right.
CT Page 12142-ba
(ii) Right to Remain Silent
 The defendant was advised in Spanish of this right. He indicated that he understood the right and waived it. Officer Velez translated for the defendant as he spoke to Detective Kennelly. There is no evidence that the defendant attempted to stop speaking with police personnel. The defendant, having the rights read to him in Spanish from the advisement of rights card, signed it, and after having translated the statement form's advisement of rights, he indicated he understood it and initialed "IC" next to each right.
(iii) Right to Counsel
 The defendant was advised of his right to counsel and of his right to consult with an attorney before questioning. The police also advised the defendant of his right to have counsel appointed if he could not afford an attorney before questioning. The credible evidence established that he was advised in Spanish of this right and he understood it and waived it. There is no evidence that the defendant asked for an attorney, or requested the use of the telephone to contact an attorney. The defendant, having had the rights read to him in Spanish from the advisement of rights card, the defendant signed it, and after having translated the statement forms advisement of rights, he understood it and initialed "IC" next to each right.
 After consideration of all the evidence, the Court finds the State has sustained its burden of proof that the defendant was advised in Spanish of his Miranda rights and that he was read the advisement portion of the statement in Spanish. The police had previously advised the defendant of his rights in Spanish on the previous day, prior to his escape. Moreover, after being read in Spanish his rights, he initialed each right. Thus, the Court finds that the defendant knowingly, voluntarily and intelligently waived his rights.
CT Page 12142-bb
Statement was not Voluntarily and Knowingly Made
The defendant claimed that this written statement was not voluntarily made.
Reference is made to section C(a)(V) addressing the law and factors concerning whether a statement is knowingly and voluntarily made. This section is incorporated by reference herein.
The process of the taking of the statement has been previously indicated. The Court concludes that the process for taking this statement was devoid of any physical threats, abuse or deprivation of food and drink.
Therefore, the Court finds that the State has sustained its burden of proof that the defendant's statement to Detective Kennelly was voluntary and that the conduct of the polite did not overbear the defendant's will to resist and bring about the statement.
 Conclusion
For all the foregoing reasons, the defendant's motion to suppress is DENIED.
 (E) Qualified Neutral Interpreter
The defendant calmed that the failure of the police to provide the defendant with a qualified neutral interpreter violated his rights to equal protection and due process under article first §§ 1, 8, 9 and 20
of the Connecticut constitution and the fifth, sixth andfourteenth amendment to the United States constitution.
The defendant has failed to establish that the presence of Officer Velez, a Spanish-speaking police officer translating for the defendant and police personnel effected the reliability, truthfulness, or the circumstances to the defendant's statements. There has been no evidence presented that Officer Velez was not fluent in Spanish and English, or that there was any confusion or misinterpretation in the translation between the police and the defendant.
The State has sustained its burden of proof that Officer Velez was qualified in his role as a Spanish translator. Therefore, the defendant's claim that the lack of a qualified neutral interpreter as a basis for CT Page 12142-bc granting the defendant's motion to suppress is DENIED.
 VI Electronic Recording
The defendant next claimed that his right to due process under article first, §§ 8 and 9, of the Connecticut constitution and the fifth andfourteenth amendments to the United States constitution has been violated because the statements of the defendant to the police were not electronically recorded.
Case law has established that "electronic recording of confessions is not a prerequisite to their admissibility at trial under [A]rticle first, § 8 of the state constitution". State v. Lapointe, supra,237 Conn. 735; State v. James, supra, 237 Conn. 428-434.
The defendant's motion to suppress based on the lack of electronic recording is DENIED.
 VII Burden of Proof to Prove Voluntariness of a Defendant's Statement
The defendant next claims that article first, §§ 8 and 9, of the Connecticut constitution required the State to prove beyond a reasonable doubt that a defendant was given Miranda warnings and that the subsequent statement was voluntary, when such statements are offered as evidence of capital felony.
This issue has been addressed by the Supreme Court of Connecticut.State v. James, supra, 237 Conn. 426 (Court rejected this highest standard of proof for the preliminary determination of voluntariness) ;State v. Lapointe, supra, 237 Conn. 728. (State bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence.)
The request to utilize the beyond a reasonable doubt standard when inquiring into the voluntariness of the defendant's statements is DENIED.
 -B- MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO SUPPRESS
CT Page 12142-bd Search Warrant for Person of Ivo Colon
The issue before this Court was whether the information contained in the affidavit of the search warrant application was sufficient to support the issuing magistrate's finding of probable cause. Defendant argued that under the Fourth and Fourteenth amendments there was no probable cause for issuance of a warrant and moved to suppress evidence the police seized pursuant to the search warrant.
The defendant claimed that the affidavit in support of the search warrant was insufficient and cannot support a finding o: probable cause under the fourth and fourteenth amendments to the federal constitution, article first, §§ 7 and 8, of the constitution of the State of Connecticut.
The facts presented in the search warrant were reviewed and are as follows:
Detective Michael Ricci and Detective Nicholas Pesce, members of the Waterbury Police Department for a combined total of 32 years, received a complaint from medical staff at St. Mary's Hospital of a dead child that had been brought into the emergency room. The child was two and one-half years old and named Keriana Tellado. The affidavit indicated that she had bruises covering her body, a large piece of hair was missing from her scalp and she had an apparent broken arm. The child's mother, Virginia Quintero, agreed to come to the police station and give a voluntary statement. Quintero's first statement indicated that she took the child to the hospital when the child fell in the bathtub and began to bleed. When asked about her boyfriend, Ivo Colon, she said that althouqh he had lived with her, he had left and was rumored to he in Puerto Rico.
Paragraph 4 of the affidavit indicated that Colon was in fact at his apartment. The police brought him to the station to interview him.
Paragraph 6 of the affidavit indicated that Virginia Quintero stated that Colon had assaulted her and her daughters, Keriana and Crystal Tellado beginning in June of 1998. Quintero's statement included a detailed description of physical assaults on Keriana Tellado up to and including July 17, 1998, which involved striking the child with Ivo Colon's "T" ring and belt. Virginia Quintero described the July 1998 assault on Keriana Tellado by Ivo Colon as physical striking with his hands and ring, and striking the child with his belt, which resulted in the apparent injuries and bloody wounds. CT Page 12142-be
Paragraph 7 of the affidavit indicated that while at the police station, Ivo Colon was observed wearing a brown colored leather belt, a gold colored ring with the letter "T" on it, a Nautica wristwatch, a ring with a stone in it, as well as a pair of high top Michael Jordan sneakers.
Paragraph 8 indicated the request for this property to be seized from the defendant in order to further investigate the crime.
The State of Connecticut submits "the search warrant is sufficient on its face and that probable cause exists in the four corners of the document and the reasonable inferences that can be drawn from the facts that a magistrate can make."
Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."
"This provision, like the fourth amendment to the federal constitution that it closely resembles, safeguards the privacy, the personal security, and the property of the individual against unjustified intrusions by agents of the government." State v. Barton, 219 Conn. 529,540, 594 A.2d 917 (1991)
"Under the fourth amendment to the United States constitution, probable cause to search exists if: (1) there is probable' cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . .; and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched . . . ." State v. Vincent, 229 Conn. 164, 171, 640 A.2d 94 (1994); State v. Cobb,251 Conn. 285, 316-17, 743 A.2d 1 (1999). "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." State v. Eady, 249 Conn. 431, 440,731 A.2d 112, cert. denied ___ U.S. ___, 120 S.Ct. 551, 145 L.Ed.2d 428
(1999) ; State v. Marsala, 42 Conn. App. 1, 6, 679 A.2d 367, cert. denied, 239 Conn. 912, 682 A.2d 1010 (1996). "Probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of CT Page 12142-bf legal rules." (Internal quotation marks omitted.) State v. Vincent, supra, 229 Conn. 171-02, quoting, State v. Zarick, 227 Conn. 207, 222,630 A.2d 565. [cert. denied, 510 U.S. 1025, 114 S.Ct. 637,126 L.Ed.2d 595
(1993)]. To determine whether there exists probable cause to search, "the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether. . . . there is a fair probability that contraband or evidence of crime will be found in a particular place." (Citations omitted.) Statev. Joyce, 243 Conn. 282, 292, 705 A.2d 181, cert. denied, 565 U.S. 1077,118 S.Ct. 1523, 140 L.Ed.2d 674 (1997). Proof of probable cause requires less than proof by a preponderance of the evidence. . . ." (Citations omitted; internal quotation marks omitted.) State v. Eady, supra, 440.
In the case before the Court, the affidavit outlined the affiant's training and experience, the information received from Virginia Quintero and from police personnel, the specifics of the crime and the evidence of the crime's specific location. The presentation of this information was specific and consistent and established a basis of reliability.
"When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate . . (Citations omitted.) State v. Cobb, supra,251 Conn. 317. "A trial court is not required to engage in de novo review of an issuing judge's probable cause determination if the validity of the warrant is challenged by the motion to suppress." State v. Diaz,226 Conn. 514, 528, 628 A.2d 567 (1993) ; see also, General Statutes § 54-33f "[A] reviewing court must uphold the validity of the warrant. . . . [if] the affidavit at "issue presented a substantial factual basis [including the inferences reasonably drawn from the affidavit] for the magistrate's conclusion that probable cause existed. . . ." (Citations omitted; internal quotation marks omitted.) State v.Diaz, supra 525.
Deferring to all reasonable inferences the issuing judge could have made from the facts contained in the affidavit, this Court must determine whether the contents of the affidavit provide a substantial factual basis upon which these reasonable inferences can be made. In making this determination, the trial court must consider the information set forth in the affidavit in the light most favorable to upholding the magistrate's determination of probable cause. State v. Nazario, 38 Conn. App. 533,595, 662 A.2d 1313 (1995), see also, State v. Duntz, 223 Conn. 207, 216,613 A.2d 224 (1992). CT Page 12142-bg
The Court determined, after considering the totality of the circumstances, there existed facts to establish probable cause that a crime had been committed and that evidence consistent with that crime existed on the person of Ivo Colon.
Accordingly, the defendant's motion to suppress tangible property is denied
BY THE COURT
Dated December 22, 2000